# United States Court of Appeals
## For the First Circuit

No. 99-1585

UNITED STATES OF AMERICA,

Appellee,

v.

WILLIAM E. FREEMAN, JR.,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. William G. Young, U.S. District Judge]

Before

Stahl, Circuit Judge,
Cyr, Senior Circuit Judge,
and Lipez, Circuit Judge.

William A. Brown for appellant.
Jennifer Zacks, Assistant United States Attorney, with whom Amy B. Lederer, Assistant United States Attorney, Donald K. Stern, United States Attorney, and the Department of Justice were on brief for appellee.

April 14, 2000

**LIPEZ, Circuit Judge**.  William E. Freeman, Jr., an officer in the Peabody, Massachusetts, police department, was convicted by a jury on two counts of witness tampering.  He was also acquitted on one count of witness tampering and one count of conspiracy to violate 18 U.S.C. § 666(a)(1)(B) (theft or bribery concerning programs receiving federal funds).[1]  Freeman complains that the evidence of witness tampering was insufficient to support the convictions.  Additionally, Freeman contends that the court should have granted his motion for a judgment of acquittal on the conspiracy charge before its submission to the jury.  If it had done so, he argues, the court would have been forced to grant a mistrial on the remaining witness tampering charges because the testimony admitted as

---

[1]Title 18 U.S.C. § 666 provides that an agent of, inter alia, any local government that "in any one year period, benefits in excess of $10,000 under a Federal program," is criminally liable if he

> corruptly solicits or demands for the benefit of any person, or accepts or agrees to  accept, anything of value from any person, intending to be influenced or rewarded in connection with any business, transaction, or  series  of  transactions  of such organization, government, or agency involving any thing of value of $5,000 or more.

On appeal, Freeman does not contest that he is an agent of a local government, or that Peabody receives the level of federal benefits required for jurisdiction under this statute.

evidence of the conspiracy was unduly prejudicial to his defense to the witness tampering charges. He further claims that he was entitled to a mistrial because the court admitted evidence of the statements of a coconspirator that it later had to strike, and because of the spillover effect on the witness tampering convictions of "bad acts" evidence admitted on the conspiracy charge. Unconvinced by Freeman's arguments, we affirm.

## I. BACKGROUND

We sketch the facts of this odd case at the outset, adding detail below as it becomes necessary to the legal discussion. In 1991, Freeman became associated with the "Golden Banana," a striptease nightclub located in Peabody, and the club's owner, Louis DiBella (DiBella). Freeman began frequenting the Golden Banana shortly after DiBella's son, Francis, was arrested on drug charges. Although Freeman was not an employee of the club, DiBella paid him approximately $100 in cash each week for almost four years. In addition, DiBella loaned Freeman money, gave him free alcoholic beverages at the club, allowed him to influence the hiring and firing of dancers, tolerated his frequent visits to the dancers' dressing room, generally off limits to men, and otherwise turned a blind eye to Freeman's erratic and sometimes violent behavior.

In 1995, a federal grand jury began investigating potential violations of federal law at the Golden Banana involving, inter alia, members of the Peabody police department. During the investigation, Freeman approached fellow Peabody police officer Michael Ward and warned him to keep his "mouth shut" about "anything that went on at the Golden Banana." Freeman also approached Amy Clarke, the master of ceremonies at the Golden Banana, telling her to "keep the lip zipped" and "not to say anything about the Golden Banana."

The grand jury indicted Freeman on five counts. Count One alleged that Freeman conspired with DiBella to receive cash payments, no-interest loans, and free alcoholic beverages, in an attempt by DiBella "to curry favor with him and to buy his silence about licensed premise violations which occurred at the Golden Banana"--i.e., a conspiracy to violate 18 U.S.C. § 666(a)(1)(B). See supra note 1. The grand jury also indicted Freeman on four counts of witness tampering in violation of 18 U.S.C. § 1512(b)(2)(A) & (b)(3): Count Two involved an unnamed Peabody police officer,[2] Count Three involved Officer Ward, and Counts Four and Five involved Amy Clarke.

---

[2]Prior to trial, the government dismissed Count Two pursuant to Fed. R. Crim. P. 48(a).

In its opening statement at trial, the government outlined its conspiracy case. According to the government, DiBella would testify that, given the controversial nature of the Golden Banana's business, he needed to stay on the "good side" of the Peabody police lest they "do things like influence his ability to retain the liquor license that he had at the Golden Banana." In addition, DiBella would testify that he feared that the Peabody police would "take away his son," Francis, because of Francis's cocaine problem. Thus, the government expected DiBella to testify that he "willingly" entered into a "corrupt relationship" with Freeman, in which he "agreed to pay bribes" to Freeman and Freeman "agreed to accept them."[3]

On the first day of trial, before the government called DiBella to the stand, it presented the testimony of Deborah Drew, the daytime manager at the Golden Banana. Drew testified that DiBella told her he provided free alcoholic beverages to police officers to avoid "beefs" with the police, and that DiBella instructed her to call the Peabody police, not the state police, in the event of a licensing violation committed on the

---

[3]DiBella himself was not charged with conspiracy. Instead, he was charged with four counts of filing false income tax returns, to which he pled guilty. As part of his plea bargain, DiBella agreed to cooperate in the government's investigation of Freeman and to testify against him at trial.

premises. Although the defense objected to this testimony as hearsay, the court provisionally admitted it under the hearsay exception for the statements of a coconspirator, Fed. R. Evid. 801(d)(2)(E), promising that it would "scrutinize it with care at the end of all the evidence."

On the second day of trial, the government called DiBella as a witness. Although DiBella testified that he made regular cash payments to Freeman, he denied that Freeman had agreed to perform any favors on his behalf. Moreover, DiBella's testimony suggested that he provided benefits to Freeman because of his fear of Freeman rather than any willing agreement between the two. Following DiBella's testimony, the court warned the government that "if Mr. DiBella is the chief witness, you're in deep serious trouble on the conspiracy count," suggesting that it did not think that the "victim of extortion is a conspirator."

As the government neared the completion of its case in chief, Freeman moved for a judgment of acquittal.[4] In ruling on the motion, the court also scrutinized the government's conspiracy evidence to determine whether it had properly allowed Drew to testify to DiBella's out-of-court statements on the

_____

[4]Although the government had not yet rested, it consented to the court's consideration of the defendant's motion for a judgment of acquittal at this time.

-7-

first day of trial. The court concluded that there was insufficient evidence of a conspiracy to admit the hearsay statements of a coconspirator, but that there was sufficient evidence to deny the motion for a judgment of acquittal on the conspiracy charge:

> [T]he Court is not persuaded by a fair preponderance of the evidence, as I make findings of preliminary fact, that at any time there existed a conspiracy between Mr. Freeman and Mr. DiBella. That requires me to strike so much of the testimony of Ms. Drew as recounted things that Mr. DiBella had to say.
>
> At the same time . . .
>
> I think that wholly apart from anything I believe about the evidence, that there is enough evidence independent of Mr. DiBella . . . that a reasonable jury could find a conspiracy. . . .
>
> So, I must deny the motion for a judgment of acquittal . . . .

Freeman then moved for a mistrial, the court took the motion under advisement, and the government presented its final two witnesses. After the government rested, Freeman renewed his motions for a judgment of acquittal and a mistrial. Again, the court denied the motion for a judgment of acquittal and left the motion for a mistrial under advisement. After concluding his

defense,[5] Freeman renewed his motions for a judgment of acquittal and a mistrial.  The court denied both motions and submitted the conspiracy charge and three witness tampering charges to the jury.  See supra note 2.

The jury acquitted Freeman of the conspiracy charge and the witness tampering count involving officer Ward, but convicted him on the two counts of witness tampering involving Amy Clarke. After the verdict, Freeman moved for a new trial, citing the "overwhelming capacity of evidence that was ostensibly admitted on one count which was the conspiracy[:] all this not very subtle character assassination, Freeman's a drinker, Freeman's going into the dressing rooms."  According to Freeman, this evidence of "bad acts," admitted for its relevance to the conspiracy count, substantially prejudiced his defense to the witness tampering charges.

The court denied the motion for a new trial, concluding that "the evidence that was improperly allowed is just too

_____

[5]Freeman's defense consisted of only three witnesses.  John Carney, a captain in the Marblehead Police Department, and Robert Marron, a Peabody police officer, were each called by the defense to impeach the credibility of Officer Ward. (The court found Marron's testimony inadmissible.)  Robert Russell, a Peabody police detective, testified that DiBella had spoken favorably of Freeman and that Francis DiBella had told him that the federal authorities were trying to get his father to say that he had paid Freeman off.  Freeman did not testify on his own behalf.

peripheral here" (referring to Deborah Drew's hearsay account of DiBella's statements to her), and that "the jury showed their independence and their ability to discern between counts" by acquitting Freeman on two of the four counts. The court sentenced Freeman to four months' incarceration followed by twenty-four months of supervised release, the first four of those months in home confinement. The court also ordered Freeman to pay a $3,000 fine and a $200 special assessment.

Freeman now appeals, arguing that the evidence was insufficient to support his convictions on the two witness tampering counts. Alternatively, he argues that the trial court erred in denying his motions for a mistrial and a new trial.

## II. SUFFICIENCY OF THE EVIDENCE

To obtain convictions for witness tampering in violation of 18 U.S.C. § 1512(b)(2)(A) & (b)(3), the government had to prove beyond a reasonable doubt that Freeman (1) "knowingly use[d] intimidation or physical force, threaten[ed], or corruptly persuad[ed]" Amy Clarke, (2) intending to induce Clarke to "withhold testimony," or to "hinder, delay, or prevent the communication to a law enforcement officer or judge of the United States of information relating to the commission or possible commission of a Federal offense." 18 U.S.C. § 1512. In evaluating the sufficiency of the evidence of witness

-10-

tampering, we must view the facts and witness credibility determinations, as well as draw reasonable inferences, in favor of the government. See United States v. Valle, 72 F.3d 210, 216 (1st Cir. 1995). "So long as the evidence, taken as a whole, warrants a judgment of conviction," the evidence is legally sufficient. United States v. Olbres, 61 F.3d 967, 970 (1st Cir. 1995). Viewed in the light most favorable to the government, the evidence shows that Freeman made statements to Clarke on two occasions that a reasonable jury could have found beyond a reasonable doubt were criminally culpable.

Freeman was aware that there was a federal investigation of activity at the Golden Banana. Based on the evidence presented by the government, the jury could infer that Freeman was also aware that his own conduct might subject him to criminal liability as a result of the investigation. Thus, Freeman had a motive to prevent potential witnesses from relaying damaging information to the government. Clarke testified that Freeman approached her at the Golden Banana and said, "I hear you've been talking and the feds are around," and stated, "remember, mum's the word." Later in the same conversation Freeman said, "remember with the feds around talking, keep the lip zipped," drawing his finger across his

lips in an accompanying gesture. Clarke testified that this exchange made her feel "a little bit intimidated."

In light of his motive to curtail the flow of information to the government, the jury could reasonably infer that Freeman selected language that he thought would intimidate, threaten, or corruptly persuade Clarke, and that Freeman did so intending to cause her to "withhold testimony" or to "hinder, delay, or prevent the communication" of information to the federal authorities investigating the Golden Banana. Although Freeman's words did not contain overt threats, a reasonable jury could infer that Freeman knew Clarke would be threatened by such words, given his status as a police officer and her first-hand knowledge of his erratic personality and violent temper.

Similarly, Freeman's statements to Clarke several weeks later at her house were sufficient to support a conviction on a second count of witness tampering. Freeman went to Clarke's house immediately following the appearance of a newspaper article about the Golden Banana that featured a front-page picture of Clarke. The jury could have inferred that Freeman went to her house at this time because the article had renewed his fear that Clarke was cooperating in the investigation. Freeman said to Clarke, "the feds [are] coming down heavy," and warned her "not to say anything about the Golden Banana."

-12-

Clarke testified that this conversation made her feel "intimidated," "very uneasy," and "awkward," and that she was so afraid of Freeman that she hid in the basement the next time he came to her house.

Again, Freeman's statements to Clarke, made in the context of a visit to her home shortly after the appearance of a newspaper article that Clarke had reason to believe had angered him, were sufficient to permit a jury to conclude that Freeman knowingly acted in a way designed to intimidate, threaten, or corruptly persuade Clarke, with the specific intent to cause her to "withhold testimony" or to "hinder, delay, or prevent the communication" of information to the federal authorities. See United States v. Shotts, 145 F.3d 1289, 1301 (11th Cir. 1998) (finding defendant's statement to his secretary to "just not say anything [to the FBI] and I wasn't going to be bothered" sufficient to support a conviction under 18 U.S.C. § 1512).

### III. THE MOTION FOR A MISTRIAL

Freeman argues that the trial court abused its discretion in denying his motion for a mistrial or a new trial for three reasons.[6] First, if the trial court had granted his

_____

[6]Because Freeman's motion for a new trial is not based upon grounds arising subsequent to judgment, the appeal is from the judgment, with the denial of his motions for a mistrial and a

-13-

motion for a judgment of acquittal on the conspiracy charge as
it should have, it would have realized that so much "bad acts"
testimony had been admitted as evidence of the conspiracy that
Freeman could not get a fair trial on the witness tampering
charges.    Second, the trial court had exacerbated the
prejudicial effect of the conspiracy evidence by allowing the
government to present the hearsay testimony of a coconspirator,
only to strike that evidence once it determined that the
government had failed to show the existence of a conspiracy by
a preponderance of the evidence.    Third, even if the court
properly submitted the conspiracy charge to the jury, the "bad
acts" evidence admitted in support of that charge substantially
prejudiced the jury's consideration of the witness tampering
charges.

As with any review of a denial of a motion for a
mistrial, we consider the totality of the circumstances to
determine whether the defendant has demonstrated the kind of

---

new trial being assigned as an error in the judgment. See 2
Charles Alan Wright, Federal Practice & Procedure: Criminal 2d
§ 559, at 367 (West 1982 & 1999 Supp.); Gray v. United States,
299 F.2d 467, 468 (D.C. Cir. 1962). Freeman's arguments in
support of a mistrial and a new trial are the same, and they are
subject to the same standard of review, see United States v.
Wihbey, 75 F.3d 761, 773 (1st Cir. 1996) ("We review a trial
judge's ruling on a motion for a mistrial, or for a new trial,
only for abuse of discretion.").   We therefore simplify our
discussion by referring hereafter only to the motion for a
mistrial.

-14-

"clear" prejudice that would render the court's denial of his motion for a mistrial a "manifest abuse of discretion." United States v. Torres, 162 F.3d 6, 12 (1st Cir. 1998). In conducting this inquiry, we are mindful that the trial court has a "superior point of vantage," and that "it is only rarely--and in extremely compelling circumstances--that an appellate panel, informed by a cold record, will venture to reverse a trial judge's on-the-spot decision." United States v. Pierro, 32 F.3d. 611, 617 (1st Cir. 1994). Where "a curative instruction is promptly given, a mistrial is warranted only in rare circumstances implying extreme prejudice." Torres, 162 F.3d at 12 (emphasis added). This is so because a mistrial is viewed as a "last resort, only to be implemented if the taint is ineradicable, that is, only if the trial judge believes that the jury's exposure to the evidence is likely to prove beyond realistic hope of repair." United States v. Sepulveda, 15 F.3d 1161, 1184 (1st Cir. 1993).

We conclude that the trial court did not abuse its discretion by denying Freeman's motion for a mistrial for the following reasons: (A) the court properly denied the motion for a judgment of acquittal on the conspiracy charge; (B) the minimal hearsay statements of a coconspirator, later stricken from the record, did not substantially prejudice the jury's

consideration of the witness tampering charges; and (C) the "bad acts" evidence admitted in support of the conspiracy charge did not spill over to substantially prejudice the jury's consideration of the witness tampering charges.

## A. The Denial of the Motion for a Judgment of Acquittal on the Conspiracy Charge

We must first note the unusual nature of this mistrial argument, premised as it is on the allegedly erroneous denial of a motion for a judgment of acquittal on a charge later rejected by the jury with a not guilty verdict. Although Freeman's logic in pursuing this argument is not always clear, we divine this meaning in his claim. If a defendant in a trial involving multiple charges succeeds in obtaining a judgment of acquittal on some of the charges at the completion of the government's case, the defendant can argue that he cannot get a fair trial on the charges that remain in the case because of the evidence presented on the now dismissed charges, and hence he is entitled to a mistrial on the remaining charges. See United States v. McNatt, 842 F.2d 564, 565-66 (1st Cir. 1988); see also United States v. Hamblin, 911 F.2d 551, 559 (11th Cir. 1990); Leach v. United States, 402 F.2d 268, 268 (5th Cir. 1968) (per curiam). Although Freeman was ultimately acquitted on the conspiracy charge, and therefore has no basis for challenging as a discrete issue on appeal the denial of his motion for a judgment of

-16-

acquittal on that charge, he argues that he should be able to make on appeal the same mistrial argument that would have been available to him if he had persuaded the court to dismiss the conspiracy charge at the completion of the government's case. That is, he should be able to argue that the denial of the mistrial request was erroneous because of the substantial prejudice created by the evidence that went to the jury in support of a conspiracy charge that should have been dismissed. Under the scenario in this case, the challenge to the judge's ruling on the motion for a judgment of acquittal, instead of being the basis for a discretely appealable issue, becomes the predicate for Freeman's first challenge to the trial court's ruling on the motion for a mistrial. See United States v. Guiliano, 644 F.2d 85, 88-89 (2d Cir. 1981) (ordering a retrial on a bankruptcy fraud count, even though the evidence was sufficient to support the conviction, because it reversed on appeal a RICO conviction and concluded that there was a "distinct risk that the jury was influenced in its disposition of [the bankruptcy fraud] count by improper evidence and by the allegations of the RICO count").

We accept the theory of Freeman's appeal on this mistrial issue. That is a pyrrhic victory, however, because we agree with the trial court's decision to deny Freeman's motion

-17-

for a judgment of acquittal on the conspiracy charge. We explain.

Federal Rule of Criminal Procedure 29(a) provides, "[t]he court on a motion of a defendant or of its own motion shall order the entry of judgment of acquittal of one or more offenses charged in the indictment or information after the evidence on either side is closed if the evidence is insufficient to sustain a conviction of such offense or offenses." Pursuant to this standard, the defendant may claim a "hopeless variance in the proof" between the crime charged and the evidence produced at trial. See 2 Charles Alan Wright, Federal Practice & Procedure: Criminal 2d § 466, at 654 (West 1982). Freeman argued that the government's evidence, especially DiBella's testimony that he was motivated by fear rather than by an agreement with Freeman, indicated that Freeman was guilty if at all of extortion, an offense not charged by the government.

Although the evidence presented by the government arguably would have lent more support to a charge of extortion than a charge of conspiracy, the evidence was sufficient to submit the conspiracy charge to the jury. To prove a conspiracy, the government must show beyond a reasonable doubt that the "defendant and one or more coconspirators intended to agree and

. . . to commit the substantive criminal offense which was the object of their unlawful agreement." United States v. Tejeda, 974 F.2d 210, 212 (1st Cir. 1992) (alteration in original). Here, the "substantive criminal offense" charged was a violation of 18 U.S.C. § 666(a)(1)(B), which prohibits an agent of a local government, like a police officer, from "corruptly solicit[ing] or demand[ing] for the benefit of any person, or accept[ing] or agree[ing] to  accept, anything of value from any person, intending to be influenced or rewarded in connection with any business, transaction, or series of transactions of such organization, government, or agency involving anything of value of $5,000 or more."  Stated in terms of the government's theory of the case, the government needed to prove that Freeman and DiBella entered into an agreement in which Freeman would "accept or agree to accept" valuable benefits from DiBella, including cash payoffs, loans, and special treatment at the Golden Banana, intending to be "influenced or rewarded" for helping DiBella and his son avoid trouble with the Peabody police or the Peabody officials who oversee the Golden Banana's license to sell liquor.

There was sufficient evidence to support the government's conspiracy theory.  First, the evidence showed that Freeman received "something of value" from DiBella in the form

-19-

of money payments and special treatment at the Golden Banana. DiBella paid Freeman approximately $100 per week in cash for almost four years, and loaned money to Freeman's brother and to one of Freeman's friends--money that was never repaid. Freeman drank for free at the Golden Banana, spent time in the dancers' dressing room, a location generally off limits to men, and enjoyed influence over DiBella's decisions to hire and fire particular dancers. DiBella continued to tolerate Freeman's presence at the club despite Freeman's erratic and sometimes violent behavior. Amy Clarke testified that Freeman would become "belligerent" when she asked him to leave the dancers' dressing room. Similarly, Thomas LeGault, the night manager at the Golden Banana, testified that on one occasion, when he asked Freeman to leave the dressing room, Freeman said, "I'll cut fucking LeGault's throat with a bottle," and threw a chair at the door.

Moreover, a reasonable trier of fact could have found that the cash payments, loans, and other special treatment that DiBella bestowed upon Freeman were not given in consideration for any legitimate work that Freeman performed on DiBella's behalf. During the relevant time, Freeman was not working as a security guard or in any other capacity at the club. Indeed, several witnesses testified that Freeman was usually drinking at

the club and was often seen intoxicated.  These facts cast doubt on Freeman's defense, advanced mainly through cross-examination and in his closing argument, that he was somehow performing surreptitious security duties for DiBella.

Second, there was some evidence that Freeman obtained the cash payments, loans, and special treatment "intending to be influenced or rewarded" for his help in insulating the Golden Banana and Francis DiBella from trouble with local police and city officials.  That Freeman began to patronize the club regularly only after Francis's arrest on drug charges might suggest that Freeman, who worked in the area of narcotics, viewed the arrest as an opportunity to trade his influence as a police officer for favors.  Deborah Drew testified that shortly before Francis was arrested, Freeman said to her that DiBella "shouldn't fuck with him . . . [and that] because of the things that Frankie [Francis] was doing, that he [Freeman] could close the club."  Francis DiBella testified that Freeman warned him that he was on the "top of the [DEA's] list," but that Freeman "would take care of it and [Francis] would have no problems."

Freeman argues that the testimony of DiBella, who was the government's star witness, fatally undermined the government's conspiracy case, requiring a judgment of acquittal.

When asked why he made cash payments to Freeman, DiBella responded:

> Why? Because I, you know, every time you talk to him it was drugs, drugs, drugs. And your son is on the top of the DEA list. And, you know, they're watching him and you got to be careful, because the City of Peabody is looking to shut you down, they want to take your license away from you. And the least little excuse they get, they'll take it away from you. So, he had me in a, like in a fearful, like something that you grow up in the North End with all the wise guys looking down your throat. If you're making a dollar, they want part of that dollar.

DiBella also testified that Freeman never so much as "fixed an overdue library card" on his behalf. Asked whether he "ever agreed with Sergeant Freeman to have him turn his back on licensing violations," DiBella answered, "I never agreed to anything like that." Freeman insists that DiBella's testimony conclusively establishes that DiBella never voluntarily agreed to trade benefits with Freeman in return for favors, but rather that DiBella was "shaken down," the victim of extortion. This, according to Freeman, foreclosed a conspiracy conviction.

The trial court disagreed and so do we. Although DiBella denied that he entered into an agreement with Freeman, the jury was entitled to disregard DiBella's testimony on this point and draw opposing inferences from DiBella's course of conduct and the testimony of other witnesses. It is elementary

-22-

that the agreement necessary to support a conspiracy conviction can "be inferred from the facts and circumstances of the case." Ianelli v. United States, 420 U.S. 770, 778 n.10 (1975). "[T]he agreement may be express or tacit and may be proved by direct or circumstantial evidence." United States v. Escobar-de Jesus, 187 F.3d 148, 175 (1st Cir. 1999). Moreover, although DiBella may have been afraid of Freeman, "a generalized fear of harm" is no defense to a conspiracy charge. United States v. Alzanki, 54 F.3d 994, 1003 (1st Cir. 1995). Evidence precluding the inference of an agreement would have to show that the duress to which DiBella was subject was "enough to overbear [his] will and make his participation in the conspiracy involuntary." Slater v. United States, 562 F.2d 58, 62 (1st Cir. 1976). While there is some evidence that Freeman acted in a generally threatening manner toward DiBella, a reasonable trier of fact could have found that the threats were not so coercive as to "overbear" DiBella's will. DiBella was a seasoned businessman[7] and the owner of a controversial adult entertainment business, as well as an admitted felon who pled guilty to lying on his federal income taxes for many years. A reasonable trier of fact may well have questioned DiBella's credibility and doubted whether

---

[7]DiBella also owned a fruit distributorship that specialized in, among other things, bananas.

-23-

DiBella could have been easily scared into making payoffs to Freeman without getting anything in return. Alternatively, the jury might have concluded that DiBella testified as he did in a self-serving attempt to deny his own participation in the alleged conspiracy.

Despite Freeman's entreaties, our conclusion upholding the trial court's denial of Freeman's motion for a judgment of acquittal on the conspiracy charge is not altered by the fact that the trial court simultaneously concluded that the government produced insufficient evidence of a conspiracy to invoke the hearsay exception for statements made by a coconspirator. Federal Rule of Evidence 801(d) provides in relevant part that a "statement is not hearsay if . . . (2) [t]he statement is offered against a party and is . . . (E) a statement by a coconspirator of a party during the course and in furtherance of the conspiracy." The rules further provide that qualification for the Rule 801 hearsay exception is to be "determined by the court." Fed. R. Evid. 104(a).

In United States v. Petrozziello, we specified that the court, in making this determination, must adhere to the ordinary civil standard of proof, allowing the testimony "if it is more likely than not that the declarant and the defendant were members of a conspiracy . . . and that the statement was in

furtherance of the conspiracy," 548 F.2d 20, 23 (1st Cir. 1977); see also United States v. Portela, 167 F.3d 687, 702 n.13 (1st Cir. 1999). We have also stated that a trial court's own evaluation of the evidence for the purposes of an evidentiary ruling does not preclude it from concluding that the jury might view the evidence differently. See United States v. Pitochelli, 830 F.2d 401, 403 (1st Cir. 1987).

Our trial system makes a sharp distinction between functions: the judge is "not a thirteenth juror, much less [is] he a super-juror whose views of credibility could override the jury's verdict." Id. Accordingly, although in a Petrozziello ruling the court can make credibility assessments and draw inferences from the facts, it must take the evidence in the light most favorable to the government in ruling on a motion for a judgment of acquittal. It is not inconsistent for a court to conclude, therefore, based on its own inferences and credibility assessments, that it is more likely than not that no conspiracy existed, while, at the same time, concluding that the evidence, viewed in the light most favorable to the government, would permit a rational juror to find the defendant guilty beyond a reasonable doubt.

For all of these reasons, we conclude that the trial court did not err in denying Freeman's motion for a judgment of

acquittal on the conspiracy charges. The court properly

submitted that charge to the jury.[8]


## B.  The Statements of a Coconspirator

As an additional argument for a mistrial, Freeman

contends that the court erred in allowing "hearsay testimony in

support of an existing conspiracy," and that this error

---

[8]Despite these rulings, the court remained concerned about the closeness of the conspiracy/extortion issue. It therefore took special care in its jury instructions to distinguish extortion, which was not charged, from the conspiracy charge at issue in this case:

> [T]here's some evidence here, if you believe it, evidence of a shakedown. Squeezing money out of people. But that's not one of the crimes charged here. That's a crime. That's extortion. But that's not one of the crimes charged here.
>
> . . . .
>
> [L]et's suppose you believe that Mr. Freeman was shaking down Mr. DiBella; that he was extorting money from him. Now, extortion is when someone pays money under a fear that if they do not pay the money that something will be done to them. If you believe evidence that the conduct here took place and the payments took place, and they took place because if they were not taking place, given Mr. Freeman's conduct, what was going on in Mr. DiBella's mind was that Mr. Freeman would trump up a charge, he would fabricate a charge, and that would injure the business. That's not the conspiracy that's being charged here.

"unfairly prejudiced Mr. Freeman with respect to the witness tampering charges." Before the trial court made its Petrozziello ruling, it had provisionally admitted the hearsay testimony of Deborah Drew. This approach is consistent with the law of this circuit which provides that "[h]earsay evidence may be admitted provisionally, subject to the trial court's final Petrozziello determination, which should be made 'at the close of all the evidence.'" Portela, 167 F.3d at 702-03 (quoting United States v. Ciampaglia, 628 F.2d 632, 638 (1st Cir. 1980)). When a court ultimately concludes that hearsay evidence provisionally admitted does not meet the Petrozziello standards, the court must "give a cautionary instruction to the jury, or, upon an appropriate motion, declare a mistrial if the instruction will not suffice to cure any prejudice." Ciampaglia, 628 F.2d at 638. The court gave a cautionary instruction. We conclude that it sufficed to cure the effect of Drew's hearsay testimony.

Deborah Drew testified that DiBella told her that he provided free alcohol to police officers to prevent the police from "causing beefs" for the club, and that DiBella instructed her to contact the local police rather than the state police if there were any licensing violation problems. Later in the trial, after DiBella testified that there was no agreement with

Freeman, the court became more reluctant to admit hearsay statements made by DiBella under the coconspirator exception. The court sustained objections to Philip Freeman, the defendant's brother, and to Amy Clarke, testifying to out-of-court statements made by DiBella. The prosecution protested the ruling with respect to Amy Clarke, prompting an admonition from the court:

> Understand that by pressing this, even if there is sufficient evidence to get to the jury on conspiracy under [Fed. R. Evid.] 104(a), I have to be persuaded by a fair preponderance of the evidence that there was a conspiracy. That's a different standard. It's not a standard that gives you all the breaks. It's the standard do I think these people were conspiring. If I do, fine. But if I don't we have to strike it out. Since you cannot unring the bell, what we're faced with is a motion for mistrial . . . .

Following this admonition, the government abandoned its strategy of questioning Clarke about DiBella's statements. As it turned out, that was a wise decision by the government because it meant that, other than the testimony of Drew, no hearsay testimony was provisionally admitted under the hearsay exception for statements of a coconspirator.

As the government's case in chief came to a close, the court made its Petrozziello ruling: "[T]he Court is not persuaded by a fair preponderance of the evidence, as I make findings of preliminary fact, that at any time there existed a

-28-

conspiracy between Mr. Freeman and Mr. DiBella.  That requires me to strike so much of the testimony of Ms. Drew as recounted things that Mr. DiBella had to say."  The trial court then instructed the jury:

> I let you hear what Ms. Drew had to say about what Mr. DiBella said to her about certain things.  And now having thought about it, and it's my responsibility, I must strike out that part of the testimony.  What Ms. Drew said the older DiBella said to her, that's just out of the case. . . . Disregard it.

Striking the evidence and issuing this curative instruction were sufficient to shield Freeman from prejudice caused by the provisional admission of Drew's hearsay testimony.  Jurors are presumed to follow the court's instructions.  See United States v. Magana, 127 F.3d 1, 6 (1st Cir. 1997).  Even assuming that the jurors wrongly considered the stricken testimony, Drew's hearsay testimony had scant relevance to the witness tampering charges of which Freeman was convicted, and their provisional admission was not likely to have had any significant prejudicial impact on the jury's evaluation of the witness tampering charges.  Moreover, Drew's brief hearsay testimony occurred in a trial that lasted seven days.

Given the minimal hearsay testimony provisionally admitted under the coconspirator exception, the peripheral impact, if any, of such testimony on the witness tampering

offenses of which Freeman was convicted, and the trial court's clear instructions to the jury to disregard the testimony, we conclude that the trial court did not abuse its discretion in denying Freeman's request for a mistrial on the basis of this provisionally admitted hearsay testimony.

## C. The Spillover Effect

In urging this third ground for a mistrial, Freeman laments that "by the close of evidence, the government had characterized [him] as a drunk, a violent man, a shakedown artist, a philanderer, an adulterer, and a rouge [sic] cop, and an all-around low life," and he complains that "the conspiracy charge was the vehicle for the admission of this evidence." Since we have concluded that the conspiracy charge was properly submitted to the jury, it follows that the jury was entitled to hear the evidence relevant to that charge. The evidence of Freeman's "bad acts" at the Golden Banana--excessive drinking, invading the dancers' dressing room, erupting in fits of violence--was relevant to the conspiracy charge because it showed that Freeman received special treatment at the nightclub: that is, that DiBella and his employees allowed Freeman to behave in a manner that would never have been tolerated if Freeman were an ordinary patron. That was the object of the unlawful agreement for which Freeman was charged--i.e., to

-30-

receive things of value, including special treatment at the nightclub, in exchange for favors provided to DiBella.

We acknowledge that the "bad acts" evidence admitted for its relevance to the conspiracy charge may have had a spillover effect on the witness tampering charges.  This potential exists whenever multiple counts or defendants are joined in a single trial.  Because the witness tampering offenses grew out of an attempt to cover up the conspiracy scheme, however, there is no doubt that the two offenses were properly joined.  See, e.g., United States v. Davis, 752 F.2d 963, 972 (5th Cir. 1985) (finding joinder proper where "the coverup attempts bear a logical relationship to underlying . . . crimes").[9]  While we have acknowledged that "[t]here is always some prejudice in any trial where more than one offense or offender are tried together," United States v. Boylan, 898 F.2d 230, 246 (1st Cir. 1990); see also United States v. Turoff, 853 F.2d 1037, 1043 (2d Cir. 1988), the possibility that a jury may think worse of the defendant because multiple related offenses are tried together is not, standing alone, grounds for a mistrial, see, e.g., United States v. Fagan, 821 F.2d 1002, 1007 (5th Cir. 1987).

---

[9]We note that Freeman neither opposed joinder nor moved to sever the conspiracy and witness tampering counts.

Also, and importantly, much of the "bad acts" evidence admitted for its relevance to the conspiracy charge was also admissible to show a motive for witness tampering. Although evidence of a defendant's bad acts may not be used "to prove character of a person in order to show action in conformity therewith," it may be "admissible for other purposes, such as proof of motive." Fed. R. Evid. 404(b). The evidence of Freeman's bad conduct at the Golden Banana was relevant to show that Freeman was aware of the criminal nature of his underlying conduct--whether characterized as conspiracy or extortion--which created a motive for witness tampering. See, e.g., United States v. Romero, 54 F.3d 56, 60 (2d Cir. 1995) (evidence relating to narcotics charges admissible to show motive to murder a government witness); Fagan, 821 F.2d at 1007 (evidence of mail fraud admissible to show motive for witness tampering). Indeed, Freeman's erratic and sometimes violent behavior provides the context for understanding why Amy Clarke felt threatened and intimidated by Freeman.

Finally, any prejudicial impact from the evidence of Freeman's conduct at the Golden Banana was mitigated by the court's clear instructions to the jury:

> It is not a crime for him to go to a strip
> joint. It is not a crime for him to flirt
> with the strippers, whatever you may think
> of that. Nor is it a crime for him to

drink, even to drink to excess. It is not a crime for him to go into the dancers' dressing room and act like a bo[o]r. Whatever you think of that, that is not a crime.

The court further emphasized that Freeman was not to be judged on any of his underlying conduct, and that "he's to be judged only on" the conspiracy and witness tampering charges.

We have held that "within wide margins, the potential for prejudice . . . can be satisfactorily dispelled by appropriate curative instructions." Sepulveda, 15 F.3d at 1184. "Jurors are presumed to follow such instructions, except in extreme cases." Magana, 127 F.3d at 6. Here, the trial court's instructions were adequate to safeguard Freeman from any substantial prejudice. Indeed, the jury demonstrated its ability to distinguish among the various counts and offenses by acquitting Freeman of conspiracy and one count of witness tampering and convicting him of the remaining two witness tampering counts. See McNatt, 842 F.2d at 566 ("The fact that the jury distinguished between different charges . . . is strong evidence that the jury actually followed the instruction."); United States v. Porter, 764 F.2d 1, 13 (1st Cir. 1985) (discriminating verdict indicated that the jurors were able to follow the court's instructions and discern among the various defendants and charges).

Simply put, upon reviewing the totality of the circumstances, we are unable to find that Freeman suffered any substantial prejudice in his defense to the witness tampering charges. The trial court did not abuse its discretion by denying Freeman's motion for a mistrial.

**Affirmed.**