# United States Court of Appeals
## For the First Circuit

---

No. 03-2632

UNITED STATES OF AMERICA,

Appellee,

v.

BRIAN BAILEY,

Defendant, Appellant.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Reginald C. Lindsay, U.S. District Judge]

---

Before

Torruella, Lipez, and Howard, Circuit Judges.

---

Evan Slavitt, with whom Richard P. O'Neil and Bodoff & Slavitt LLP were on brief, for appellant.
Wan J. Kim, Deputy Assistant Attorney General, with whom R. Alexander Acosta, Assistant Attorney General, Michael J. Sullivan, United States Attorney, S. Theodore Merritt, Assistant United States Attorney, Jessica Dunsay Silver and Gregory B. Friel, Attorneys, Department of Justice, Civil Rights Division, were on brief, for appellee.

---

May 3, 2005

---

**HOWARD**, **Circuit Judge**. Brian Bailey was one of seven jailers charged with federal offenses arising from five incidents at the Nashua Street Jail in Boston, Massachusetts, where guards employed excessive force against pretrial detainees and then acted to conceal their misconduct. The grand jury's superseding indictment charged all seven defendants with conspiracy to deprive pretrial detainees of their civil rights in violation of 18 U.S.C. § 241 (the "global conspiracy" charge). Bailey was also charged with assaulting and aiding and abetting the assault of a pretrial detainee, see 18 U.S.C. § 242; conspiring to obstruct and obstructing a federal criminal investigation, see 18 U.S.C. § 1512(b)(3) (the witness tampering statute); and perjury (for lying to a federal grand jury), see 18 U.S.C. § 1623.

Three of the defendants pleaded guilty to the global conspiracy charge and to their individual substantive charges, and the trial of the fourth defendant was severed. Bailey and the other two remaining defendants were tried together. Bailey's two co-defendants were acquitted on all counts. Bailey was acquitted of the global conspiracy charge, but was convicted of the other charges and sentenced to 41 months in prison. He now appeals his convictions and sentence.

**I.**

The following facts are either uncontested, or, if contested, are presented in the light most favorable to the

-2-

verdicts.  See United States v. McCann, 366 F.3d 46, 48 (1st Cir. 2004).

Boston's Nashua Street Jail, operated by the Suffolk County Sheriff's Department, houses pretrial detainees.  On September 24, 1999, Officer Bailey and Officer Michael Ross were assigned to work in the jail's psychiatric unit.  On that day, the psychiatric unit housed a pretrial detainee who was on suicide watch.  In accordance with jail policy, the detainee was stripped of his clothes and denied sheets and blankets to prevent their use in a suicide attempt.  His only covering was a paper "johnny."

During the course of the afternoon, the detainee complained repeatedly that his cell was cold and that he needed a blanket.  When Ross denied his request, the detainee began screaming, swearing, and punching and kicking his cell door.  He persisted in this behavior for approximately three hours.  At about 4 p.m., Bailey told Ross that "he had [had] enough" of the detainee and that he was going to "bang him out."  Ross replied that they should wait until later that evening.

Bailey left the unit for dinner at about 5:30 p.m.  While at dinner, he saw Officer Paul Davis, a member of the Sheriff's Emergency Response Team.  The Team is summoned to jail emergencies by way of an electronic alarm that all officers carry.  Bailey informed Davis that he was having a problem with an inmate and that Davis might hear his alarm go off later that night.

-3-

When Bailey returned from dinner, he and Ross discussed entering the detainee's cell to "slap him around." Since Ross and Bailey were not ordinarily authorized to enter a detainee's cell without permission from a superior, they fabricated a story to justify their actions. They initially agreed to report that the detainee had made a mess in his cell, that they had entered the cell to clean it, and that they were attacked upon entry.

At 6:30 p.m., Officer Brian Murphy arrived at the psychiatric unit to relieve Ross so that the latter could go to dinner. Ross notified Murphy of the plan to enter the detainee's cell. Murphy replied that he wanted no part of it and that they had "better write a good report." Undeterred, Ross and Bailey put on gloves and entered the detainee's cell. Ross approached the detainee and yelled at him to be quiet. When the detainee refused, Ross slapped his face several times and then delivered multiple "knee strikes," driving his knee into the victim's thigh. Bailey joined the attack by punching the detainee several times in the ribs and shoulder. As he was being struck, the detainee cried and complained of back pain. The detainee was then pushed down onto his bed, and Bailey and Ross attempted to handcuff him. At no point during the altercation did the detainee assault the officers or make any threatening gestures. He did not fight back other than to resist the handcuffing.

Bailey's alarm was activated at some point during the melee. The Emergency Response Team, including Davis and Deputy Anthony Nuzzo, arrived shortly thereafter. They placed handcuffs on the detainee and strapped him in a restraint chair. While secured in the chair, the detainee cried and complained of back pain. Bailey informed Ross later that night that he had slapped the detainee while he was restrained in the chair. Bailey also bragged to Davis that he and Ross had "beat the fuck out of" the detainee.

Shortly after the incident, Bailey consulted with Nuzzo, who told him that the story about entering the detainee's cell to clean up a mess was not adequate cover for the beating. Nuzzo advised Bailey to report that he and Ross had entered the detainee's cell because of an apparent medical emergency, only to be attacked upon their entrance. After further discussion, Bailey and Ross decided to go with this revised "medical emergency" fabrication in their incident reports. They stood by this story when subsequently questioned by Sheriff's Department investigators who were conducting an internal inquiry. Relying in part on what they were told by Bailey and Ross, the investigators filed a report concluding that the officers had acted appropriately. This report, containing the false statements, was subsequently obtained by the FBI in connection with an investigation of a separate incident of excessive force at the Nashua Street Jail.

In October 2000, Bailey was summoned to testify before a federal grand jury about the September 24, 1999 incident. He testified that he had entered the detainee's cell because he thought the detainee was having a seizure, that the detainee jumped up and attacked him, and that no one struck the detainee during the incident. At trial, however, Bailey admitted that he had intentionally lied to the grand jury in an effort to protect himself and Ross.

## II.

### A.    Obstruction of Justice

As set forth above, Bailey was convicted of violating and conspiring to violate the federal witness tampering statute by knowingly engaging in misleading conduct with the intent to prevent the communication of information concerning the commission of a federal crime to a federal law enforcement officer. See 18 U.S.C. § 1512(b)(3). Bailey argues that the prosecution failed to prove the intent element of this crime, and that the jury was improperly instructed on this point. Underlying Bailey's argument is the premise, rejected by the district court, that the intent required by the statute cannot be found when there was no federal investigation extant or imminent at the time of the alleged misleading conduct.[1]

---

[1]In making this argument, Bailey also suggests that his conduct did not fall within the statute's sweep because his misstatements were made to Sheriff's Department investigators who,

Bailey's interpretation of § 1512(b)(3) is not consistent with its plain language, which reads:

> Whoever knowingly uses intimidation, threatens, or corruptly persuades another person, or attempts to do so, or engages in misleading conduct toward another person, with intent to . . . hinder, delay, or prevent the communication to a law enforcement officer or judge of the United States of information relating to the commission or possible commission of a Federal offense . . . shall be fined under this title or imprisoned not more than ten years, or both.

18 U.S.C. § 1512(b)(3). Nothing in this provision implies that a federal investigation must be imminent or underway at the time of the actus reus. To the contrary, and as several circuits have recognized, the statutory language suggests that Congress intended § 1512(b)(3) not merely to safeguard the integrity of ongoing or imminent federal investigations, but more broadly to facilitate federal law enforcement's ability to gather information about

_____

he argues, were not federal "law enforcement officer[s]" for the purposes of the statute. This argument misunderstands the government's case theory. The government did not allege that the Sheriff's Department investigators were the federal "law enforcement officers" to whom the statute refers; the government alleged that the investigators were the <u>witnesses</u> who ultimately relayed Bailey's misinformation to federal law enforcement officers. <u>See</u> <u>United States</u> v. <u>Baldyga</u>, 233 F.3d 674, 680 (1st Cir. 2000) (holding that the requirements of the statute are satisfied so long as the possibility exists that the defendant's misinformation will eventually be communicated to federal officials). That these witnesses were themselves county law enforcement personnel does not change the analysis. <u>See</u> <u>United States</u> v. <u>Veal</u>, 153 F.3d 1233, 1245 (11th Cir. 1998) (holding that state police investigators "become witnesses as a matter of course in each investigation in which they are involved").

possible federal crimes -- including federal crimes that are not yet under investigation at the time of the offense. See, e.g., United States v. Guadalupe, 402 F.3d 409, 411 (3d Cir. 2005) ("[P]roving a violation of 18 U.S.C. § 1512(b)(3) does not depend on the existence or imminency of a federal investigation but rather on the possible existence of a federal crime and a defendant's intention to thwart an inquiry into that crime by officials who happen to be federal."); United States v. Perry, 335 F.3d 316, 321 (4th Cir. 2003) (finding a violation of § 1512(b)(3) where the defendant provided false information to local police intending to prevent the initiation of a federal investigation into his status as a felon in possession of a firearm), cert. denied, 124 S. Ct. 1408 (2004); United States v. Veal, 153 F.3d 1233, 1250 (11th Cir. 1998) ("By its wording, § 1512(b)(3) does not depend on the existence or imminency of a federal case or investigation but rather on the possible existence of a federal crime and a defendant's intention to thwart an inquiry into that crime.").[2]

---

[2]Bailey argues that three extra-circuit cases interpreting § 1512(a)(1)(C) -- United States v. Emery, 186 F.3d 921 (8th Cir. 1999); United States v. Causey, 185 F.3d 407 (5th Cir. 1999); and United States v. Bell, 113 F.3d 1345 (3d Cir. 1997) -- have implicitly recognized that a federal investigation must be at least imminent, if not underway, to support a conviction under the witness tampering statute. But none of these cases implies such a rule. They merely require the government to prove that the defendant was at least partially motivated by a desire to prevent communication between a witness and a law enforcement officer concerning the commission or possible commission of a federal offense, and that the officer was in fact a federal officer. See Emery, 186 F.3d at 925; Causey, 185 F.3d at 421-23; Bell, 113 F.3d

-8-

Accordingly, we reject Bailey's argument that § 1512(b)(3) requires an existing or imminent federal investigation at the time of the defendant's misleading conduct.

In reaching this conclusion, we acknowledge Bailey's argument that 18 U.S.C. § 1512(f)(1) supports reading a pending-or-imminent-federal-investigation requirement into § 1512(b)(3). Section 1512(f)(1) provides that, for purposes of certain provisions of the obstruction of justice statute, "an official proceeding need not be pending or about to be instituted at the time of the offense." Bailey would have us draw a negative inference from Congress's explicit statement that an "official proceeding" need not be underway or imminent -- i.e., that Congress contemplated that a federal investigation, contrary to an official proceeding, must be pending or about to be instituted at the time of the offense.

Such a negative inference is not warranted. For one thing, § 1512(f)(1) does not apply to § 1512(b)(3) because § 1512(b)(3) does not require that the proscribed conduct occur in the context of an "official proceeding." See Veal, 153 F.3d at 1250. And even if § 1512(f)(1) did apply, its application would

_____

at 1348-49; see also United States v. Stansfield, 171 F.3d 806, 816-18 (3d Cir. 1999). Nothing logically precludes these statutory elements from being satisfied where, as here, the misleading conduct reasonably could be found to have been intended to prevent the commencement of what would prove to be a federal investigation into a federal offense.

support our ruling because the federal grand jury investigation to which Bailey's misstatements eventually led (which, per § 1512(f)(1), need not have been underway or imminent at the time of the offense) constitutes an "official proceeding" within the meaning of § 1512(f)(1). See 18 U.S.C. § 1515(a)(1)(A) (defining an official proceeding for purposes of § 1512(f)(1) as, among other things, a proceeding before a federal grand jury); United States v. Frankhauser, 80 F.3d 641, 651 (1st Cir. 1996) ("Both a federal trial and a federal grand jury investigation are 'official proceedings' within the meaning of the statute.").

Before concluding, we also acknowledge Bailey's argument that a failure to read a pending-or-imminent-federal-investigation requirement into § 1512(b)(3) raises due process and ex post facto concerns because it leaves open the possibility of a prosecution for conduct that no defendant could have understood to constitute a federal offense at the time of its commission. We do not see how this is so. Section 1512(b)(3) requires that the misleading conduct affect the communication of information "relating to the commission or possible commission of a federal offense." Therefore, the statute applies only to obstructive behavior that the defendant knows could impede an investigation into conduct that could constitute a federal crime at the time of its commission.[3]

---

[3]Of course the statute does not require that the defendant specifically know that the underlying conduct could constitute a federal offense. See Baldyga, 233 F.3d at 681.

-10-

Here there can be no claim that it would be unconstitutional to apply the statute to Bailey, whom the jury reasonably found was aware of the conduct giving rise to the eventual federal civil rights charges at the time he misled the Sheriff's Department investigators.

### B.    Aiding and Abetting

The prosecution presented two theories for conviction on the substantive civil rights charge:  that Bailey was a principal, or, alternatively, that he aided and abetted Ross in the assault. Bailey argues that the jury instruction on aiding and abetting was erroneous.  Because the verdict form does not specify the theory under which the jury found Bailey guilty, and because Bailey's claim is one of legal error rather than sufficiency of the evidence, the availability of an alternate theory of conviction would not save the jury's verdict.  See Griffin v. United States, 502 U.S. 46, 59 (1991) ("Jurors are not generally equipped to determine whether a particular theory of conviction submitted to them is contrary to law."); United States v. Boots, 80 F.3d 580, 589 (1st Cir. 1996) (general verdict that may have been grounded on legally erroneous theory requires setting aside verdict on all grounds).  We thus assume arguendo that the guilty verdict was grounded on the challenged aiding-and-abetting theory.

Bailey raises two issues regarding the aiding-and-abetting instructions.  Primarily, he contends that the jury was

wrongly instructed to find him guilty if it found that he failed to act when he had a legal obligation to do so, because, he says, an affirmative act must be proved.  Alternatively, he argues that it was not appropriate to give a failure-to-act instruction in this case because the prosecution presented no evidence or argument that Bailey had a legal obligation to act.  Because Bailey failed to object to the instructions with the requisite specificity, see Fed. R. Crim. P. 30(d), our review is only for plain error, see Fed. R. Crim. P. 52(b); United States v. Olano, 507 U.S. 725, 732-36 (1993).  A defendant alleging plain error must show that an error occurred which was clear or obvious and which not only affected the defendant's substantial rights, but also seriously impacted the fairness, integrity, or public reputation of judicial proceedings. Olano, 507 U.S. at 732-36.

Bailey has fallen well short of meeting the demanding plain-error test.  The district court provided the jury with a seven-paragraph aiding-and-abetting instruction.  Within this comprehensive instruction, the court stated:

> In order to aid and abet another to commit a crime, a defendant must willfully and knowingly have associated himself in some way with the crime, and willfully and knowingly have sought by some act to help make the crime succeed. Participation in a crime is willful if action is taken voluntarily and intentionally, or, in the case of a failure to act, with the specific intent to fail to do something the law requires to be done.

(emphasis added).  Bailey argues that the instruction misstates the law to the extent that it countenances criminal liability for a failure to act.  He cites a number of cases for the proposition that an aider and abettor must have "affirmatively participated" in the crime.  See, e.g., United States v. Martin, 228 F.3d 1, 18 (1st Cir. 2000); United States v. Indelicato, 611 F.2d 376, 385 (1st Cir. 1979).

But the government did not allege that Bailey merely stood by while his partner attacked the detainee.  Rather, the government's theory, elucidated in closing argument, was that Bailey struck the detainee himself, or, at a minimum, that he actively participated in his partner's assault by "[g]oing into a locked cell for no legitimate reason, knowing that force was going to be used and then assisting [Ross], whether [by] holding [the detainee] down or really just emboldening [Ross] by preventing the inmate from defending himself."

Because the government did not proceed on a failure-to-act theory, the court's instruction on that point was extraneous.  But it is highly unlikely that this extraneous reference, when read in the context of an otherwise correct seven-paragraph instruction, misled the jury to believe that it could convict Bailey simply for failing to intervene in the attack.  See Jones v. United States, 527 U.S. 373, 391 (1999) ("[Jury] instructions must be evaluated not in isolation but in the context of the entire charge.").  This

-13-

is especially so given the clarifying instruction that immediately followed the passage to which Bailey objects:

> The mere presence of a defendant where a crime is being committed, even coupled with knowledge by the defendant that a crime is being committed, or the mere acquiescence by a defendant in the criminal conduct of others, is not sufficient to establish aiding and abetting. An aider and abettor must have some interest in the criminal venture.

This instruction properly safeguarded against any misapplication of the failure-to-act instruction. See id. (holding that instructions that may appear problematic when read in isolation "can be cured when read in conjunction with other instructions").[4]

## C.     Bodily Injury

Bailey next contends that the prosecution failed to introduce evidence sufficient to permit a rational jury finding of bodily injury for the purposes of his felony conviction under 18 U.S.C. § 242. In determining the evidentiary sufficiency of a guilty verdict, we review the totality of the evidence in the light

---

[4]We note, too, that the extraneous instruction was not substantively wrong. Indeed, the language to which Bailey objects is a standard definition of willfulness that federal courts regularly employ in aiding-and-abetting instructions. See, e.g., United States v. Gordon, 290 F.3d 539, 543 (3d Cir.), cert. denied, 537 U.S. 1063 (2002); United States v. Brown, 151 F.3d 476, 486 (6th Cir. 1998); United States v. Monteiro, 871 F.2d 204, 208 (1st Cir. 1989). It is a hornbook definition. See, e.g., 1 L. Sand, et al., Modern Federal Jury Instructions, Instr. 11-2 (2004) ("Participation in a crime is willful if done voluntarily and intentionally, and with the specific intent to do something which the law forbids or with the specific intent to fail to do something the law requires to be done; that is to say, with a bad purpose either to disobey or to disregard the law.") (emphasis added).

-14-

most favorable to the government, and then ask whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." United States v. Henderson, 320 F.3d 92, 102 (1st Cir. 2003) (quoting United States v. Woodward, 149 F.3d 46, 56 (1st Cir. 1998)).

A felony conviction under 18 U.S.C. § 242 requires proof that the defendant "willfully subject[ed] [a] person . . . to the deprivation of any rights, privileges, or immunities secured or protected by the Constitution or laws of the United States, . . . if bodily injury results [from such deprivation]." Although the statute does not define "bodily injury," the term is defined identically in four other provisions of Title 18. See 18 U.S.C. §§ 831(f)(5); 1365(h)(4); 1515(a)(5); 1864(d)(2) (all defining "bodily injury" as "(A) a cut, abrasion, bruise, burn, or disfigurement; (B) physical pain; (C) illness; (D) impairment of [a/the] function of a bodily member, organ, or mental faculty; or (E) any other injury to the body, no matter how temporary"). The Eleventh Circuit has applied this definition in § 242 cases. See United States v. Myers, 972 F.2d 1566, 1572 (11th Cir. 1992) (noting that "[w]hen Congress uses, but does not define a particular word, it is presumed to have adopted that word's established meaning") (citing Davis v. Michigan Dep't of Treasury, 489 U.S. 803, 813 (1989)). We follow suit and adopt the established definition of "bodily injury" for the purposes of § 242. The district court's jury instruction

-15-

regarding bodily injury, although not identical, was consistent with this definition.[5]

Bailey argues that the only proof of bodily injury was the evidence that the detainee cried after the assault. He argues that people cry for a variety of reasons, and, therefore, crying alone could not establish physical pain. But the record reflects that the evidence of physical pain goes beyond the detainee's post-attack crying. The prosecution elicited testimony that the detainee suffered multiple blows to the head, shoulder, ribs, and thighs, and that he cried both during and after the attack. Moreover, Ross testified that the detainee specifically complained of back pain during and after the incident. Bailey himself stated after the incident that he and Ross had "beat the fuck out of [the detainee]." Taken together, the evidence above provides a sufficient basis for a rational trier of fact to find bodily injury for the purposes of a § 242 felony conviction.

### D.    Prejudicial Spillover

Bailey asserts that the majority of his trial was centered on the government's theory that there was a global conspiracy among the guards at the Nashua Street Jail that involved beating detainees and then covering up their crimes by filing false

---

[5]With no objection from Bailey, the district court instructed the jury that a bodily injury could include "any injury to the body, no matter how minor, slight or temporary, and includes burns, cuts, abrasions, bruises or physical pain."

reports and lying to investigators.  According to Bailey, when the jury acquitted all three defendants of this global conspiracy, the district court should have "taken a step back" to reassess the prejudicial impact of the conspiracy evidence on the separate substantive charges.  In essence, he argues that the conspiracy evidence tainted the jury's consideration of the substantive charges and therefore entitles him to a new trial on those charges.

Bailey's argument is specious.  As an initial matter, Bailey had ample opportunity to seek severance prior to trial pursuant to Fed. R. Crim. P. 14.  To the extent that the prejudice Bailey alleges could not be detected prior to trial, he could also have moved for a mistrial, though "mistrials grounded on spillover prejudice are rare." United States v. Houlihan, 92 F.3d 1271, 1284 (1st Cir. 1996).  Bailey raised his claim of spillover prejudice for the first time in his motion for a new trial, and even then, in the vaguest of terms.  In this case, the record demonstrates that the district court took appropriate measures to safeguard against potential spillover prejudice by instructing the jury to consider the evidence separately as to each count.  Cf. United States v. Houle, 237 F.3d 71, 76 (1st Cir. 2001) (instructions to the jury to consider the evidence separately as to each defendant were an adequate safeguard against the possibility of prejudicial spillover).  We presume that jurors follow such instructions.  See United States v. Freeman, 208 F.3d 332, 345 (1st Cir. 2000).  And,

indeed, the verdict in this case suggests that the jury was able to "distinguish among the various counts." Id. Bailey's two co-defendants at trial, who were also charged with the global conspiracy, were acquitted on all counts. Such a discriminating verdict is strong evidence that the jury successfully compartmentalized the evidence and applied the appropriate evidence to the appropriate counts and defendants. Houle, 237 F.3d at 76; Freeman, 208 F.3d at 345-46.

### E.    Sentencing

At Bailey's sentencing, the district court, applying the then mandatory United States Sentencing Guidelines, raised the basic offense level of twelve by six because Bailey had acted under color of law, see U.S.S.G. § 2H1.1(b)(1), by two because Bailey had obstructed justice, see id. § 3C1.1, and by two because the court found by a preponderance of the evidence that the victim was vulnerable, see id. § 3A1.1(b)(1). Bailey's enhanced offense level of 22 yielded a sentencing range of 41 to 51 months. The court sentenced Bailey to 41 months in prison, followed by two years of supervised release.

In Bailey's opening appellate brief, he asserts that the district court's vulnerable-victim finding was erroneous because the court failed to make a particularized inquiry into the victim's situation, instead focusing solely on the victim's generic status as a prisoner in the psychiatric unit. In subsequent briefs,

-18-

Bailey argues that a remand is necessary in light of the Supreme Court's recent decisions in <u>Blakely</u> v. <u>Washington</u>, 542 U.S. ___, 124 S. Ct. 2531 (2004) (calling into question the constitutionality of the Guidelines), and <u>United States</u> v. <u>Booker</u>, 543 U.S. ___, 125 S. Ct. 738 (2005) (severing the provisions making the Guidelines mandatory in order to preserve the Guidelines as an advisory system). We consider these arguments in turn.

### 1. Vulnerable-Victim Finding

Under U.S.S.G. § 3A1.1(b)(1), the base offense level should be raised two levels if "the defendant knew or should have known that a victim of the offense was a vulnerable victim." The Guidelines define a "vulnerable victim" as "a person (A) who is a victim of the offense of conviction . . . ; and (B) who is unusually vulnerable due to age, physical or mental condition, or who is otherwise particularly susceptible to the criminal conduct." U.S.S.G. § 3A1.1, cmt. n.2. "We have interpreted the term 'susceptible to the criminal conduct' as being 'primarily concerned with the impaired capacity of the victim to detect or prevent the crime, rather than the quantity of the harm suffered by the victim.'" <u>United States</u> v. <u>Donnelly</u>, 370 F.3d 87, 92 (1st Cir. 2004) (quoting <u>United States</u> v. <u>Fosher</u>, 124 F.3d 52, 55-56 (1st Cir. 1997)).

A sentencing judge must make two separate determinations before imposing a § 3A1.1(b)(1) enhancement: First, the judge must

-19-

conclude "that the victim of the crime was vulnerable, that is, that the victim had an 'impaired capacity . . . to detect or prevent the crime.'" Donnelly, 370 F.3d at 92 (quoting Fosher, 124 F.3d at 55-56). Second, the judge must find "that the defendant knew or should have known of the victim's unusual vulnerability." Id. We review the district court's "interpretation and application" of the Guidelines de novo and its factual findings for clear error. United States v. Savarese, 385 F.3d 15, 18 (1st Cir. 2004).

Bailey's argument is concerned solely with the first prong of the test -- whether the victim was vulnerable. There is overwhelming evidence in the record supporting the district court's conclusion that he was. As the court explicitly found, the victim was on suicide watch, was deemed a threat to himself or others, was stripped of his clothes, was cold, and was not allowed out of his cell even to get food. In light of these findings, we are at a loss to comprehend Bailey's suggestion that the court failed to make a sufficiently particularized inquiry into the victim's situation.

### 2. **Blakely/Booker** Challenge

Bailey next contends that the vulnerable-victim finding violated his Sixth Amendment right to have a jury find all the facts impacting upon his sentence beyond a reasonable doubt. Bailey did not object on these grounds below or so argue in his

opening brief, but raised the argument for the first time in his reply brief (which was filed after the Supreme Court's <u>Blakely</u> decision). While this appeal was under advisement, the Supreme Court issued its decision in <u>Booker</u>. Thereafter, Bailey and the government filed supplemental briefs addressing whether, in light of <u>Booker</u> and our subsequent circuit precedent, Bailey's case should be remanded to the district court to determine whether re-sentencing is necessary.

Because Bailey made no arguments in the district court concerning the constitutionality of the Guidelines or the application of the Guidelines to his sentence under <u>Blakely</u> or <u>Apprendi</u> v. <u>New Jersey</u>, 530 U.S. 466 (2000), we review only for plain error. <u>See</u> <u>United States</u> v. <u>Antonakopoulos</u>, 399 F.3d 68, 76 (1st Cir. 2005).[6]

Under the four-part plain error test outlined in <u>Olano</u>, we grant relief only if we find (1) an error, (2) that is plain, and that not only (3) affected the defendant's substantial rights, but also (4) "seriously affect[ed] the fairness, integrity or public reputation of judicial proceedings." <u>Id.</u> at 77 (quoting

---

[6]In so framing the issue, we reject Bailey's suggestion that his initial challenge to the vulnerable-victim enhancement was sufficient to preserve his <u>Booker</u> argument for plenary review. Although we treat "almost any colorable claim" as preserving <u>Booker</u> error, <u>see</u> <u>United States</u> v. <u>Heldeman</u>, 402 F.3d 220, 224 (1st Cir. 2005), here it is clear that Bailey's objection was directed solely to the sufficiency of the evidence supporting the district court's finding.

-21-

Olano, 507 U.S. at 736). The defendant bears the burden of persuasion with respect to all four elements of the test. See United States v. González-Mercado, 402 F.3d 294, 302 (1st Cir. 2005) (citing Antonakopoulos, 399 F.3d at 77).

The first two prongs are satisfied where, as here, the district court treated the Guidelines as mandatory at sentencing. See Antonakopoulos, 399 F.3d at 77. To meet the third prong of the test Bailey must show a "reasonable probability" that the district court would impose a more favorable sentence to Bailey under the now "advisory" Guidelines. Id. at 75. "[W]e are inclined not to be overly demanding as to proof of probability where, either in the existing record or by plausible proffer, there is reasonable indication that the district judge might well have reached a different result under advisory guidelines." United States v. Heldeman, 402 F.3d 220, 224 (1st Cir. 2005).

Bailey has failed to present us with any argument regarding the probability of a sentence reduction in his case. Rather, he invites us to disregard Antonakopoulos and hold instead that the burden should rest with the government to defend the pre-Booker sentence, at least where "there was no [guilty] plea and a variety of sentencing issues were considered by the district court." Under such circumstances, Bailey argues, we should presume that the district court would have analyzed the case differently were it not for the mandatory nature of the Guidelines.

We decline Bailey's invitation to ignore <u>Antonakopoulos</u>. Absent unusual circumstances not present here, panels of this court are bound by prior circuit decisions. See <u>United States</u> v. <u>Rodriguez</u>, 311 F.3d 435, 438-39 (1st Cir. 2002).[7] Because Bailey has entirely failed to "advance any viable theory as to how the <u>Booker</u> error" prejudiced his substantial rights, and because we find nothing in the record to "suggest a basis for such an inference," we deny Bailey's request to remand for re-sentencing. <u>González-Mercado</u>, 402 F.3d at 303.[8]

## III.

For the reasons set forth herein, we **affirm** Bailey's convictions and sentence.

---

[7]To the extent Bailey seeks to distinguish his case from <u>Antonakopoulos</u>, his effort is unpersuasive. In <u>Antonakopoulos</u>, as here, the district court imposed a sentence following a jury trial and conviction; there was no guilty plea. See 399 F.3d at 71; <u>see also</u> <u>United States</u> v. <u>Carpenter</u>, ___ F.3d ___, 2005 WL 708335 at *1 (1st Cir. Mar. 29, 2005). Moreover, the district court in <u>Antonakopoulos</u> arguably faced a more complex set of sentencing issues than were presented here. See <u>Antonakopoulos</u>, 399 F.3d at 82 (noting that the district court had made no less than three factual findings resulting in sentence enhancements beyond that authorized by the jury verdict and also denied a request for a downward departure).

[8]For the same reasons we reject Bailey's request for re-argument concerning his <u>Booker</u> claim.