William E. FREEMAN, Jr., Petitioner,

v.

UNITED STATES of America, Respondent.

No. CIV.A. 01–10629–WGY.

United States District Court, D. Massachusetts.

Sept. 23, 2003.

Robert M Goldstein, Boston, MA, for William E. Freeman, Jr., Petitioner.

Amy B. Lederer, United States Attorney's Office, Boston, MA, for USA, Respondent.

*MEMORANDUM AND ORDER*

YOUNG, Chief Judge.

## I. INTRODUCTION

On April 13, 2001, the petitioner, William E. Freeman, Jr. ("Freeman") filed a motion pursuant to 28 U.S.C. § 2255 seeking to vacate, set aside, or correct his criminal conviction or, in the alternative, his sentence. [Docket No. 1]. Freeman claims that the government's failure to provide him with a copy of a September 11, 1998 letter from a Dr. Loren Schechter ("the Schechter letter"), the psychiatrist for Amy Clarke ("Clarke"), represented a violation of Freeman's constitutional right to due process and was a violation of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Pet'r Mem. [Docket No. 1] at 1–2. This letter indicated that Clarke, the government's chief witness at Freeman's trial, suffered from a Bipolar Disorder. *Id.* at 1. The government does not dispute that Dr. Loren Schechter's ("Schecter") letter was sent, they simply deny ever receiving it and argue that even if it was received it never found its way to the attorneys prosecuting this case. Gov't Resp. to Pet'r Mot. [Docket No. 7] at 5–6; Gov't Post–Hr'g Br. in Op. [Docket No. 19] at 8–9. The Office of the United States Attorney was in the process of relocating from its former offices to the John Joseph Moakley United States Courthouse when Schechter's letter would have been received. Evidentiary Hr'g Tr. (Apr. 18, 2002) [Docket No. 18] at 13.

Freeman further claims that even if the Schechter letter was never received, the government was using a witness with an impeachable past and was therefore under a constitutional duty to request such information from the witness, an obligation they utterly failed to meet. Pet'r Mem. at 24–25. Freeman had requested any psychiatric information about Clarke from the government before trial in an Omnibus Discovery Motion, which he argues accentuated the government's responsibility to inquire of Clarke directly. Pet'r Post–Hr'g Mem. [Docket No. 21] at 17–19.

Lastly, Freeman claims that if the government did not knowingly conceal the Schechter letter nor was under a duty to inquire of Clarke's psychiatric history, his trial counsel was arguably ineffective in failing to discover Clarke's extensive mental problems and not questioning her at trial as to how such problems affected her perception. Pet'r Mem. at 27–29. Freeman reserved this aspect of his petition, seeking an evidentiary hearing to help establish whether his trial counsel was somehow responsible for the failure to discover and utilize the Schechter letter and other evidence concerning Clarke's psychiatric history. *Id.* at 28–29.

## II. BACKGROUND and FACTS

### A. Freeman's Criminal Trial

Freeman, a former police officer in the Peabody Police Department, was charged in a five count indictment of one count of conspiracy to accept corrupt payment, in violation of 18 U.S.C. § 371 and 18 U.S.C. § 666, and four counts of witness tampering, in violation of 18 U.S.C. § 1512(b)(2)(A) and (b)(3). Pet'r Mem. at 2. The conspiracy charge alleged that Freeman had corruptly accepted cash payments, free drinks, and other items of value from Louis DiBella ("DiBella"), the owner of the Golden Banana, an adult striptease club located in Peabody, Massachusetts. Gov't Resp. to Pet'r Mot. at 2. One of the witness tampering counts was dismissed; of the remaining three, one involved fellow Peabody police officer Mike Ward and two involved Clarke. Pet'r Mem. at 2. Clarke was the mistress of ceremonies at the Golden Banana and the witness tampering counts regarding Clarke focused on two distinct conversations she had with Freeman. Gov't Resp.

to Pet'r Mot. at 2–3. Clarke was central in Freeman's conviction of these two counts as her testimony was uncorroborated, that is, without her testimony, these charges could not have been proven. Pet'r Mem. at 13, 23–24.

On October 15, 1998, the jury returned a verdict of not guilty on the underlying conspiracy charge and the witness tampering charge involving Mike Ward, but convicted Freeman of the two counts of witness tampering involving Clarke. *Id.* at 2. Freeman was sentenced by this Court on January 6, 1999 to four months incarceration followed by twenty-four months of supervised release. *Id.* On January 19, 2000, Clarke passed away. *Id.* at 6. Freeman appealed his conviction on August 16, 1999 without making any argument as to the failure of the prosecution to turn over psychiatric evidence, and, on April 14, 2000, the First Circuit Court of Appeals affirmed. *United States v. Freeman,* 208 F.3d 332 (1st Cir.2000). Freeman's sentence was stayed during his appeal but he has since served the four months and was scheduled to be released from probation in mid-December, 2002. Pet'r Mem. at 2–3.

This Court recites the evidence consonant with the jury's verdict. In 1991, Freeman became associated with the Golden Banana, and its owner, DiBella, after DiBella's son was arrested on drug charges. *Freeman,* 208 F.3d at 335. Though he was never employed by the club, Freeman was paid $100 a week in cash by DiBella for four years. *Id.* DiBella also loaned Freeman money; gave him free alcoholic beverages at the club; allowed him to influence the hiring and firing of dancers; and tolerated his frequent visits to the dancers' dressing room, which was generally off limits to men. *Id.* DiBella testified he was afraid of Freeman due to his erratic personality and violent temper. *Id.* at 336. According to DiBella's testimony at trial, as well as that of other witnesses, Free-

man was not the only Peabody police officer DiBella attempted to bribe or to whom he provided free drinks and access. *Id.*

In 1995, a federal grand jury began investigating potential violations of federal law at the Golden Banana involving, *inter alia,* members of the Peabody Police Department. *Id.* at 335. During this investigation, Freeman approached Clarke at the Golden Banana and said, "I hear you've been talking and the feds are around," and stated, "Remember, mum's the word." *Id.* at 338. Later in the same conversation Freeman said, "Remember with the feds around talking, keep the lip zipped," drawing his finger across his lips in an accompanying gesture. *Id.* Clarke testified that this exchange made her feel "a little bit intimidated." *Id.* A few weeks later, Freeman went to Clarke's house immediately following the appearance of a newspaper article about the Golden Banana that featured a front-page photograph of Clarke, and said to her, "The feds [are] coming down heavy" and warned her "not to say anything about the Golden Banana." *Id.* Clarke testified that this conversation made her feel "intimidated," "very uneasy," and "awkward," and that she was so fearful of Freeman that she hid in the basement the next time he came to her house. *Id.*

During the discovery phase of Freeman's trial, Freeman filed a motion wherein he requested the government to produce, among other things, "[a]ll physical, mental, visual, or psychiatric treatments and/or impairments and treatment (including legal or illegal use of drugs and excessive use of alcohol) which could affect the witness' accuracy, and full details concerning same." Pet'r Mem. at 3. The government responded that it had previously agreed to provide the defendant with all exculpatory material and psychiatric data

as addressed in the Court's Standing Order of January 29, 1998, which stated:

Second, the government must produce any data it has with respect to the testimonial faculties of any witness. That witness' ability to observe, remember, or relate coming to this case. That means the government must produce any psychiatric data that it has which bears on the witness' ability to observe the conduct about which the witness is going to testify, or the witness' ability to remember or relate such conduct at the time when the witness comes to testify.

.    .    .    .    .

I think with respect to—we'll take alcoholism, psychosis, drug addiction, other things which impair the faculties and your ability to know what's going on around you or accurately to give testimony about it. Those types of impairments, if they existed during the time that the testimony is sought to be elicited concerning, or if they exist now, are discoverable. I don't think—but again, other judges may think differently about this—that the simple fact that sometime in the past a person was an alcoholic and is therefore, thereafter a recovering alcoholic, or that the person had a drug addiction or that person suffered some nervous or mental impairment, necessarily is discoverable nor do I think it's necessarily ... the subject of testimony at trial.

The last time I had to visit this was in that *Butt* and *Semon* case [*United States v. Butt*, 753 F.Supp. 44 (D.Mass. 1990)] and my thoughts ... are that we ought not get into shading over into what is, in effect, just character testimony which is forbidden by 404(a) because sometime in the past a witness had those impairments. But [if] those impairments go to something either at the time of the conduct observed about which the witness is going to testify, or the witness' capacity at the time of trial, they're both discoverable.

Pet'r Mem. at 3–4 (quoting Standing Order (Jan. 29, 1998) in *United States v. Freeman*, CR–98–10028–WGY, at 6, 9–10).[1] According to Freeman's trial counsel, Daniel O'Connell, Esq. ("O'Connell"), no evidence of Clarke's past psychological history was turned over to the defense until after trial. Pet'r Mem. at 4.

**B. The Schechter Letter**

Clarke testified in September and October, 1998. On September 11, 1998, Schechter, the Chief of the Mental Health Department of the Peabody Office of Harvard Vanguard Medical Associates, had sent a letter to the Office of the United States Attorney. Evidentiary Hr'g (Apr. 18, 2002), Ex. 1 (Letter from Schechter to Office of the United States Attorney of 9/11/98). Schechter also provided a copy of this letter to Clarke before she began to testify. *Id.* at 1. This letter stated:

Ms. Amelia Clarke has a Bipolar (Manic Depressive) Disorder and is currently in the midst of a major depressive episode. She also suffers from diabetes, hypertension and asthma. Testifying in a trial at this time would be extremely stressful for her. As her psychiatrist, I believe it is likely she would decompensate under rigorous questioning by attorneys. In my opinion, and that of her primary care clinicians, her medical and psychiatric problems would be seriously intensified by her participation in a trial.

*Id.* Schechter also provided a copy of this letter to one of Clarke's "primary care clinicians" referenced above, Claire Dun-

---

1. This Standing Order was later superceded by the Local Rules of the United States District Court for the District of Massachusetts concerning the same subject matter. *See* D. Mass. L.R. 116.2.

bar, R.N., C.S. ("Dunbar"). *Id.* Dunbar had written a letter to the Office of the United States Attorney on September 10, 1998, in which she stated that Clarke had:

> serious *medical* problems that, in my opinion, could be gravely aggravated by a court appearance. If it is necessary to have her statement, please arrange some alternate means of acquiring her testimony that would not put such stress on her fragile medical condition.

Evidentiary Hr'g (Apr. 18, 2002), Ex. 2 (Letter from Dunbar to Office of the United States Attorney of 9/10/98, at 1) (emphasis added).

The government attorneys and investigators have provided sworn affidavits to the Court indicating not only that they never received the Schechter letter, but also that they knew nothing about Clarke's psychiatric history prior to trial. Gov't Resp. to Pet'r Mot., Attachs. 1–5 (Lederer Aff. ¶ 7–8; Pearlstein Aff. ¶ 3; Bellingreri Aff. ¶¶ 3–4; Brennan Aff. ¶¶ 3–4; White Aff. ¶¶ 4–5). In these affidavits several of the government attorneys and investigators admit that Clarke told them she had a letter from her "doctor," stating in effect "she should not testify at trial because of her poor health." *Id.*, Attachs. 1, 3, 4 (Lederer Aff. ¶ 8; Bellingreri Aff. ¶ 3; Brennan Aff. ¶ 3).

Government counsel in the case who interviewed and prepared Clarke for testimony, Amy Lederer, Esq. ("Lederer"), stated in her affidavit that "Clarke never revealed to me at any time that she was under the care of a psychiatrist or that she suffered from manic depression" and instead discussed her physical ailments of diabetes, emphysema, and hypertension. *Id.*, Attach. 1 (Lederer Aff. ¶ 7). Lederer admitted that, approximately one or two weeks before Clarke was scheduled to testify, Clarke told her of a letter from her "doctor" saying she should not testify due to "poor health," but Clarke never indicated that the letter was from her *psychiatrist. Id.* ¶ 8. Lederer indicated that the next time she saw Clarke, Clarke talked about a "doctor's letter" but never showed it to Lederer. *Id.* Given that Clarke had two letters from two different health care professionals in her possession, it is impossible to know to which "letter" she was referring, though the repeated references to "poor health" seem to point to Dunbar's letter, which refers only to her physical medical problems. Despite the fact that Clarke's doctor was advising against her appearing on the witness stand, Clarke agreed to testify. *Id.* ¶ 9. All the government investigators and attorneys have stated that, whenever they were with Clarke, she appeared lucid, coherent, and responsive and never displayed any outward signs or symptoms of Bipolar Disorder or depression; further, her memory was good and her version of the relevant events was consistent. *Id.*, Attachs. 1–5 (Lederer Aff. ¶ 10; Pearlstein Aff. ¶ 4; Bellingreri Aff. ¶ 3; Brennan Aff. ¶ 3; White Aff. ¶ 3). The Court concurred in this outward assessment when it found Clarke *medically* able to testify even though she suffered from a variety of physical ailments for which she was, and had been, taking medication. *See* Hr'g Tr. (Feb. 27, 2002) at 3.

In cross-examining Clarke, counsel for Freeman skillfully suggested through his questions that the medications she was taking for diabetes, hypertension, emphysema, and high blood pressure may have affected her perception of relevant events and that her physical condition may have done the same. Pet'r Mem. at 19–21 (citing Trial Tr. in *United States v. Freeman,* CR–98–10028–WGY (Oct. 7, 1998) at 65–66, 74–77, 102). In hindsight, Clarke made cryptic reference to Schechter's letter, but Freeman's attorney missed its import.

O'Connell: At any point in the past did you participate in any rehabilitation program for alcohol?

Clarke: I have a letter with me, a certified one from a doctor, *and another one,* that I shouldn't be here today. *But I didn't even show it.*

O'Connell: Ma'am?

Clarke: Because of what's wrong.

O'Connell: Ma'am, please.

Clarke: No.

O'Connell: I'm not asking you that. I'm asking you—

Clarke: No, sir.

O'Connell: —if you had been. The answer is no?

O'Connell: And had you been under a doctor's care at the time you were working at the Golden Banana?

Clarke: Yes, from the day one.

O'Connell: From day one, '86?

Clarke: I was—before that. Yes.

O'Connell: While under this doctor's care?

Clarke: Yes.

*Id.* at 19 (emphasis added) (quoting Trial Tr. in *United States v. Freeman,* CR–98–10028–WGY (Oct. 7, 1998) at 65–66). Here, Clarke seems directly to refer to the Schechter letter ("another one") but also buttresses the government's claim that she never showed it to the attorneys prosecuting the case ("But I didn't even show it."). Understandably, both parties overlooked this brief and cryptic reference to the Schechter letter at trial.

## C. Post–Trial Evidence of Clarke's Psychiatric History

Two separate letters written after Freeman's trial indicated that Clarke had an extensive history of psychiatric problems. First, on February 24, 1999, Denise Hansen ("Hansen"), a friend of Freeman's, wrote this Court and stated in her letter that Clarke "is a manic depressive and very ill" and had been "treated in hospitals for years." Letter from Hansen to the Court of 2/24/99, at 3–4 [*United States v. Freeman,* CR–98–10028–WGY, Docket No. 94]. She also stated flatly, "as you know, your honor, manic depressive[s] are chronic liars." *Id.* at 4. The courtroom clerk properly docketed this letter and sent copies to both the government and to either the petitioner himself or his attorney. This letter also references "two letters that were addressed and dated Sept. 13th, to the U.S. Attorney's Office, stating that Amy [Clarke] should not testify for she is a manic depressive and very ill." *Id.* at 3. Hansen did not mention Dr. Schechter, described two letters instead of one, and dated the letter as September 13th and not September 11th, but it can be assumed she was talking about the Schechter letter. Hansen went on to detail conversations she said she had with Clarke's daughter Robin, which revealed that her mother had lied but feared making this fact known as it would open her up to a charge of perjury. *Id.* Hansen stated that Robin's husband, Renee, had talked to Robert Jubinville, Esq. ("Jubinville"), Freeman's appellate counsel, and let him know of the existence of these letters. *Id.* at 4.

On April 24, 2000, Marilyn Wilkins ("Wilkins"), a longtime friend of Clarke's, wrote to Mark Pearlstein in the Office of the United States Attorney. *See* Resp. to Pet'r Mot., Attach. 7 (Letter from Wilkins to Pearlstein of 4/24/00). She included a copy of the Schechter letter and stated, based on this letter and discussions with Clarke after the trial, "I do not believe that justice was served." *Id.* at 1. She also mentioned that while she did not believe O'Connell had ever seen this letter, she knew that Clarke's daughter Robin had turned this letter over to Jubinville "for appeal purposes" but that "it couldn't be used when the brief was filed." *Id.* Wilkins did not believe a copy of this letter

previously had been given to the Office of the United States Attorney by anyone she knew. *Id.*

Wilkins later gave an affidavit on April 11, 2001. Pet'r Mem., Ex. 3 (Wilkins Aff.). In the affidavit, Wilkins stated that Clarke was suffering from a Bipolar Disorder, had routinely sought psychiatric admittances to several area hospitals, and was seeing a psychiatrist, Dr. Schechter, at the time of the trial, *id.* ¶ 3; that she believed Clarke had lied in her testimony at Freeman's trial and that she had tried to contact Freeman to tell him this, *id.* ¶ 4; that Clarke's son Brett and daughter Robin told her they believed their mother had lied at trial and that Mr. Freeman had never threatened her, *id.* ¶ 8; that Clarke broke down crying immediately after learning of Freeman's conviction and would not answer when Wilkins asked her if she had lied, *id.* ¶ 5; that Clarke had to be taken to the hospital three days after learning of Freeman's conviction, *id.;* that after admittance into a nursing home, Clarke told Wilkins "[i]t doesn't pay to lie about people because what goes around comes around and look at me," *id.* ¶ 7; and that Clarke was "not the same person" after the trial and neglected her physical appearance, *id.*

### D. The Post–Trial Evidentiary Hearing

On April 18, 2002, the Court held an evidentiary hearing for the purpose of determining whether Dr. Schechter had indeed written the Schechter letter; whether he sent it; the mail receipt policies of the Office of the United States Attorney of the District of Massachusetts; and whether anyone in that office, specifically the government attorneys prosecuting this case, had seen the letter. Evidentiary Hr'g Tr. (Apr. 18, 2002) [Docket No. 18] at 12, 20–21. After full opportunity for argument and presentation and examination of

the relevant witnesses, the Court made the following findings:

FIRST: Dr. Schechter's letter was material exculpatory information. Amy Clarke was the main government witness in this case, and her testimony in support of the verdict of conviction was in significant respects uncorroborated, the jury having rejected other aspects of the government's case. For this reason, the document was material.

SECOND: The Schechter letter was properly addressed, stamped, and mailed to the Office of the United States Attorney, which gives rise to the common law presumption that it was received.

THIRD: No attorney in the Office of the United States Attorney ever read the Schechter letter. It was received, but with the office in a state of transition, the letter "went through the cracks." There was no bad faith here on the part of the government attorneys.

*See id.* at 78–80. The Court invited the parties to brief the legal consequences of these findings and what relief should flow from them regarding Freeman's habeas petition. *Id.* at 78. The Court now addresses these issues.

### III. DISCUSSION

Freeman's claim was made within the one-year limitations period for motions under 28 U.S.C. § 2255 and was thus timely filed. It is based on an alleged constitutional violation under *Brady* and its progeny.

### A. Alleged Brady Violation

■ Freeman claims the government violated its duty to disclose material exculpatory information under *Brady* and its progeny by failing to turn over the Schechter letter to the defense. *See Brady,* 373 U.S. at 87, 83 S.Ct. 1194. Freeman argues that the Schechter letter could

have been used to impeach the credibility of the government's main witness, Clarke. *See* Pet'r Mem. at 9. The Supreme Court has held that impeachment evidence regarding a government witness is subject to disclosure under *Brady. See United States v. Bagley,* 473 U.S. at 667, 676, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985); *Giglio v. United States,* 405 U.S. 150, 154, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). To prevail on a *Brady* claim, Freeman must show that the prosecution failed to disclose evidence, that the evidence was favorable to his defense, and that the evidence was material. *See Bagley,* 473 U.S. at 676, 105 S.Ct. 3375.

## 1. Materiality

Evidence is material if "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Bagley,* 473 U.S. at 682, 105 S.Ct. 3375. The government challenges the Court's earlier materiality determination, correctly pointing out at the April 18, 2002 evidentiary hearing that admitting the Schechter letter to impeach Clarke's credibility during cross-examination would have been problematic under Federal Rules of Evidence 404(a) and 608. Therefore, the government argues, the prejudice requirement for a *Brady* violation cannot be satisfied because evidence deemed inadmissible can never affect the outcome of a trial.

The government is incorrect. The First Circuit has held that evidence concerning the psychological history of a government witness may properly impeach credibility if the defense can show the mental disorder of the witness, during the relevant time frame, that is, at trial or at the time the events were observed, affected the witness' ability to perceive and remember events,

or affected her ability to testify truthfully. *United States v. Butt,* 955 F.2d 77, 82 (1st Cir.1992); *see also United States v. Moore,* 923 F.2d 910, 913 (1st Cir.1991); *United States v. Gonzalez–Sanchez,* 825 F.2d 572, 585–86 (1st Cir.1987).

The Schechter letter on its own does not speak to the effects of Clarke's Bipolar Disorder, if any, during the time she came into contact with Freeman. It does, however, directly and unequivocally mention that she was suffering from psychological problems at the time she was to testify. *See* Evidentiary Hr'g (Apr. 18, 2002), Ex. 1 (Letter from Schechter to Office of the United States Attorney of 9/11/98, at 1). The severity and effects of these problems are not mentioned, just that they exist. *See id.* True, the letter properly can be characterized as conveying more a concern for the effect testifying will have on Clarke's mental health than a warning that she may not be able to testify truthfully or accurately, but on its own the Schechter letter would have raised a flag and Freeman's counsel certainly would have explored the matter further. Without more, the Schechter letter itself indeed could not have been admitted, but timely disclosure of the letter would have allowed Freeman's counsel to inquire of Schechter directly to obtain further information as to the severity of Clarke's disorder, its effects on her ability to recall events and testify, and the meaning of the nebulous term "decompensate" that he used in the letter. Moreover, armed with the Schechter letter, Freeman's counsel could have called his *own* expert psychiatric witness to develop these points further. Therefore, the absence of the Schechter letter foreclosed a promising avenue of investigation for the defense, and, for this reason, its nondisclosure would have been a violation of *Brady*[2] if the government possessed it.

---

2. The Court notes that the government implicitly admitted the materiality of the Schechter

letter at the April 18, 2002 evidentiary hear-

The Schechter letter was material; it brought into question the reliability of the government's main, and uncorroborated, witness. Exclusion of its contents could not have been "harmless error," and there was, as required when making the case for a *Brady* violation, a reasonable probability that the Schechter letter, if disclosed, could have affected the outcome of the trial. *Bagley*, 473 U.S. at 682, 105 S.Ct. 3375. Indeed, the Schechter letter could reasonably have been taken to "put the whole case in such a different light as to undermine confidence in the verdict." *Kyles v. Whitley*, 514 U.S. 419, 435, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995).

### 2. Possession by the Government

The Court has already ruled that the letter was material exculpatory information that should have been turned over and that the failure to do so was due to the fact that the relevant government actors *never saw the letter;* the failure was not due to bad faith, a shirking of duty, or a decision by the government that a particular piece of evidence was not sufficiently material or exculpatory to necessitate its being disclosed to the defense. *See* Evidentiary Hr'g Tr. (Apr. 18, 2002) at 78–80. The Court determined at the evidentiary hearing, *see id.* at 80, and reiterates here, that the government acted in complete good faith. All persons working on this case for the government have submitted affidavits to the Court proffering that they

knew nothing of Clarke's psychiatric history and that Clarke never informed anyone questioning her of the existence of the Schechter letter or of her past psychiatric treatment. *See* Gov't Resp. to Pet'r Mot., Attachs. 1–5 (Lederer Aff.; Pearlstein Aff.; Bellingreri Aff.; Brennan Aff.; White Aff.). Wilkins and Clarke's daughter Robin never made the existence of this letter or Clarke's mental health problems known to the government pretrial; rather, they informed the Court and Freeman's counsel directly after the trial. *See* Resp. to Pet'r Mot., Attach. 7 (Letter from Wilkins to Pearlstein of 4/24/00).

■ At common law, there is a presumption that a letter properly stamped, addressed, and delivered to the United States Postal Service will in due course reach the addressee. This presumption operates here in the federal courts. *See United States v. Stewart,* 472 F.2d 1114, 1118 (1st Cir.1973) (discussing "the presumption of regularity in mail delivery"). Moreover, it has not been entirely rebutted by the government. Thus it is reasonable to infer, and the Court draws the inference, that the Schechter letter physically made it into the hands of some employee of the Office of the United States Attorney but that employee never appreciated its significance and, in the confusion attendant to the move from the old courthouse, the letter was never properly transmitted.

---

ing when it responded to a direct inquiry from the Court that asked what it would have done with the Schechter letter had it been received. *See* Evidentiary Hr'g Tr. (Apr. 18, 2002) at 62. Recognizing the importance of the letter, the government responded that it would have thought itself under an obligation to turn the letter over and that it would have disclosed it, without conceding its relevancy, either to the defense or the Court or both, and at the very least would have disclosed its existence to the Court *in camera*. *Id.* at 62–63, 72. If the government had shown this

letter *in camera,* the Court surely would have asked that the letter be turned over to the defense to allow them to develop possible impeachment evidence. So while the Schechter letter itself may not have been admitted at trial, its disclosure still would have been mandated as a matter of course and would have given the defense a possible avenue of attack to fully investigate and develop, and the relevancy of the letter would then have been an evidentiary matter for argument at trial.

■ Due to some clerical error, therefore, it is as if the government never actually possessed the Schechter letter. Because the government did not possess or know of the material exculpatory information, there is no *Brady* violation in this case. *See United States v. Josleyn,* 206 F.3d 144, 154 (1st Cir.2000) ("[O]nly the evidence that the defendants have shown was actually known to the government is subject to the *Brady* standard."); *see also United States v. Sepulveda,* 15 F.3d 1161, 1179 (1st Cir.1993) ("[T]he rigors of *Brady* do not usually attach to material outside the federal government's control ...").

### 3. Duty to Inquire

■ Freeman argues that under *United States v. Osorio,* 929 F.2d 753 (1st Cir. 1991), a prosecutor "using a witness with an impeachable past has a constitutionally derived duty to search for and produce impeachment evidence requested regarding the witness." *Id.* at 761. The prosecutor cannot bury his head in the sand and refuse to inquire of a witness facts that may lead to impeachment evidence. *Id.* From this holding, Freeman argues that the government had a duty to ask Clarke directly about her mental health history after the defense requested such information in its Omnibus Motion. Pet'r Mem. at 24–25. It is true that in complying with *Brady* a prosecutor has a duty to find any evidence favorable to the defendant that is known by the prosecution team, which includes their fellow attorneys and the police or FBI agents investigating the crime, that is, those acting on the government's behalf in the case against the accused. *See Kyles* 514 U.S. at 437, 115 S.Ct. 1555; *Strickler v. Greene,* 527 U.S. 263, 281, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999). The Court has found in this case, however, that none of the aforementioned prosecution team had any knowledge of the Schechter letter or Clarke's psychiatric history. Evidentiary Hr'g Tr. (Apr. 18, 2002) at 79–80. Conceding this, Freeman is arguing for some *independent* duty on the part of the government, when asked for such information by the defense, to seek out impeachment evidence based on its witnesses' mental health history.

The First Circuit has held no such independent duty on the part of the government exists. In a directly apposite case, the court held that the prosecutor is under no duty "to seek out and disclose exculpatory or impeaching material not in the government's possession." *United States v. Bender,* 304 F.3d 161, 164 (1st Cir.2002). In *Bender,* the defendant sought psychological information about a government witness and claimed a *Brady* violation because the government turned over this information on the eve of trial. *Id.* at 163. Refusing to find the delay in turning over the impeaching material prejudicial, the court held that there was no constitutionally derived duty on the part of the government independently to search for impeachment evidence that derived from its witnesses' mental health. *Id.* at 164. The government was only required to turn over such information when it was in the government's possession, and there was "no evidence here that the prosecutor, or anyone acting on behalf of the federal government, was aware of [the witness'] mental health history until [he] disclosed the information on the eve of trial." *Id.* The First Circuit distinguished *Osorio* on the ground that in *Osorio,* "the prosecutor had failed to discover—*from colleagues within his own office*—that the prosecution's chief witness was a major drug dealer." *Id.* (emphasis in original).

■ This holding ends the discussion. Under *Bender,* the request for impeachment evidence in the form of the psychological history of a government witness does not create an independent duty for the prosecutor to inquire directly as to

witness' mental health. The prosecutor is only required to turn over information he possesses, and here the government possessed nothing until after Freeman's trial.

### B. Alleged Ineffective Assistance of Counsel

██ It is important to note that Freeman's ineffective assistance of counsel claim is against his trial counsel, Daniel O'Connell, Esq. ("O'Connell"), and not his appellate counsel, Robert Jubinville, Esq. ("Jubinville"). While the facts are not clear on this point, it appears that Jubinville learned of Clarke's psychiatric problems before Freeman's appeal or while it was pending. The Court does not so find that this was the case, as, again, the factual record currently before the Court does not mandate this conclusion. In any case, it is clear from the record and the evidentiary hearing that O'Connell did not know of Clarke's psychiatric problems or the Schechter letter until well after Freeman's trial and he was not responsible in any way for the failure to discover them. The Court assumes those findings dispose of Freeman's ineffective assistance of counsel claim, but briefly addresses the matter below for the sake of completeness and clarity.

*Strickland v. Washington,* 466 U.S. 668, 685–94, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), defines the standard for ineffective assistance of counsel claims. There are two components that a petitioner must establish: deficient performance of counsel and prejudice resulting from that deficient performance. *Id.* at 687, 104 S.Ct. 2052. In this case, Freeman's claim of ineffective assistance of counsel fails because the first prong is simply not satisfied.

Simply put, O'Connell did an outstanding, professional job for Freeman and was a thoroughly effective advocate. His performance resulted in acquittal on the underlying conspiracy charge, dismissal of one of the witness tampering counts, and acquittal on one other such charge. Pet'r Mem. at 2. He handled the entire defense with exemplary integrity, passionate involvement in his client's cause, and an unremitting intellectual commitment to the pursuit of justice. While his client was found guilty of tampering with Clarke, *id.,* O'Connell ably challenged the government's case regarding her and presented the jury with, in the Court's mind, a close decision. His overall representation of Freeman was not only competent, but well above average and even exceptional.[3]

More importantly, O'Connell inquired directly as to the psychiatric history of the government's main witness, Clarke, and was given nothing. Pet'r Mem. at 3. He can therefore hardly be accused of not attempting to investigate this matter. He reasonably relied upon the government's representation that it would provide any psychiatric data on Clarke that it had, and he most likely, and understandably, concluded that none existed when none was disclosed. True, he could have inquired of Clarke's psychiatric history himself by speaking with other Peabody residents, and he perhaps would have discovered persons like Wilkins who knew of Clarke's previous hospitalizations. O'Connell, however, was already stretched thin defending all the other aspects of this case, and to hold as matter of law that he should have followed up this avenue in view of the government's nondisclosure would put a burden upon defense attorneys that very few could reasonably bear. It is the gov-

---

**3.** Daniel O'Connell's superb performance in this case was typical of his dedication to the law and to the fair and honest defense of those accused of crime. He died on September 24, 2002, aged 56. I am proud to say he was a trial practice student of mine at Boston College School of Law.

ernment that possesses the true resources fully to investigate its witnesses' background.

The second prong of *Strickland,* prejudice, thus need not be reached.

## IV. CONCLUSION

While it may seem patently unfair to determine that because of a clerical error on the part of a clerk at the Office of the United States Attorney for the District of Massachusetts the government is absolved from a *Brady* violation for not turning over the Schechter letter to Freeman, fairness dictates such a result. The government never possessed the letter. Clarke's testimony at trial and the sworn affidavits of the prosecution team make it clear she never revealed her psychological history to the government, and under *Bender,* the government was not required to investigate independently. The government did not commit—and indeed could not have committed—a *Brady* violation because it never had the material evidence in its possession until after the trial.

Accordingly, the Defendant's Motion to Vacate, Set Aside, or Correct Sentence under 28 U.S.C. § 2255 [Docket No. 1] is DENIED.

SO ORDERED.